**BURNSIDE SHIPPING COMPANY,**
Plaintiff,

v.

**FEDERAL MARINE TERMINALS,**
Defendant.

No. 66 C 593.

United States District Court
N. D. Illinois,
Eastern Division.

May 19, 1967.

Paul McCambridge, McCreary, Hinslea, Ray & Robinson, Chicago, Ill., for Burnside Shipping.

John Hough, Spray, Price, Hough & Cushman, Chicago, Ill., for Federal Marine Terminals.

## MEMORANDUM OPINION

MAROVITZ, District Judge.

Motion for Summary Judgment, and Plaintiff's Motion to Dismiss Counterclaim

Gordon T. McNeill, a stevedore superintendent employed by Federal Marine Terminals, died on June 2, 1965, at approximately 8:45 a. m., as a result of a fall into the Number 3 starboard deep tank of the M/V OTTERBURN. Mr. McNeill is survived by his widow, age 28, and three minor children, ages 8, 6, and 2, who are receiving compensation benefits pursuant to the Longshoremen's and Harbor Workers' Compensation Act (33 U.S.C. Sections 901–950). A claim was filed under such Act by the widow for herself and her children. Thereafter, the Department of Labor entered a compensation order for weekly payments of $36.75 to Mr. McNeill's widow and $33.25 (total) for the three children, which is currently being paid by Federal Marine Terminals.

The M/V OTTERBURN, a 504 foot ocean freighter, arrived in Chicago on May 31, 1965, and moored at the Federal Marine Dock. Employees of Federal Marine worked aboard the ship May 31 and June 1, until they ceased work at about 4:00 p. m. of June 1, and replaced the hatch covers due to rain. The deep tank in question had been worked on by the ship's crew in Detroit, prior to coming to Chicago, in order to make it, along with other cargo areas, suitable to receive a cargo of grain. The original plan had been for grain to be loaded while at Chicago, but this plan was changed and the deep tanks were not filled until the vessel called, sometime later after the accident, at Three Rivers, Canada. The work of cleaning the deep tanks was begun in Detroit and continued on May 31 in Chicago by Federal Marine employees.

Federal Marine Terminals had been employed to continue with the work of readying the vessel for its grain cargo. Acting on instructions from the vessel's Chief Officer, the boatswain, in the presence of McNeill, "winged out" the deep tank lids (i. e., pulled outboard into the wings of the 'tween deck, leaving only the corner of the cover on the hatch coaming). This was done in preparation for receipt of grain in Chicago, prior to the accident. The deep tank lids were not replaced prior to the accident. There was no railing, wire, or guard of any kind placed around the deep tank opening until shortly after the accident. The area around the deep tank opening was dark, there being no artificial lighting present. The number three main deck hatch was covered except that one or two pontoons had been removed from the forward end to furnish daylight for the Federal Marine employees working in the 'tween deck feeder. Portable cargo lamps or "clusters" for lighting the 'tween decks and lower holds were aboard the vessel but not in use or in place at the time of the accident.

At that time McNeill was supervising the work of the stevedores and was properly in the area of the number three starboard deep tank. Federal Marine employees, including McNeill, first came aboard the vessel at approximately 7:00

a. m. on June 2, 1965, to continue with preparations for the receipt of grain. McNeill was last seen shortly after 8:00 a. m. There were no eye witnesses to the accident. McNeill's body was discovered shortly after 8:45 a. m., lying face up on the bottom of the number three starboard deep tank.

There are two cases pending before this Court, both resulting from the death of McNeill. The administratrix of McNeill's estate filed a maritime wrongful death action against Burnside Shipping Company, the owner of the Otterburn (No. 65 C 1655). In a separate action against Federal Marine Terminals, (No. 66 C 593), the shipowner seeks, indemnification for any judgment which it may be required to pay in the wrongful death action. Federal Marine Terminals filed an Answer to the action brought by Burnside. In addition, it filed a counterclaim against Burnside seeking indemnification for all payments made by Federal Marine, or by its insurer, pursuant to the Longshoremen's and Harbor Workers' Compensation Act, to Mrs. McNeill and/or her children. The latter payments by Federal Marine Terminals' insurer, in behalf of its insured, have a potential total liability of approximately $70,000.

Burnside has filed a motion for summary judgment on its claim, and Federal Marine Terminals has submitted a similar motion on the counterclaim. In addition, Burnside moves to dismiss the counterclaim on the ground that it does not state a cause of action.

### Plaintiff Burnside's Motion for Summary Judgment

▇▇ It is settled law that a shipowner has a nondelegable duty to furnish to longshoremen employees of the stevedore a seaworthy vessel and a safe place to work. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). But if injuries are caused by hazards which the longshoremen either created or had the primary responsibility

or opportunity to eliminate or avoid, the shipowner, although vicariously liable to the longshoremen, has a right to indemnity against the stevedore. Albanese v. N. V. Nederl Amerik Stoomy Maats Inc., 346 F.2d 481 (2d Cir. 1965); Mortensen v. A/S Glittre, 348 F.2d 383 (2d Cir. 1965). The recovery is premised upon the stevedore's breach of its warranty of workmanlike performance. Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956).

▇▇ Furthermore, even if the shipowner created the unsafe conditions by his negligence, the stevedore is still liable if his own negligence has brought the unseaworthiness of the vessel into play. Mortensen, supra, 348 F.2d at 385; Crumady v. J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). See Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964). Negligence of the stevedore's employees is imputed to the stevedore. Lusich v. Bloomfield Steamship Co., 355 F.2d 770 (5th Cir. 1966); D/S Ove Skou v. Hebert, 365 F.2d 341, 350 (5th Cir. 1966). Although in some instances, the shipowner's conduct may be sufficiently wrongful to preclude recovery on the stevedore's indemnity, it was concluded in *Albanese*, supra, and reaffirmed in *Mortensen*, supra, that the conduct "must at the least prevent or seriously handicap the stevedore in his ability to do a workmanlike job" or amount to "active hindrance of the contractor in the performance of its contractual duties."

Burnside is willing, solely for purposes of this motion, to assume that it furnished an unseaworthy craft specifically manifested by the unguarded number three starboard deep tank. Nevertheless, it posits, Federal Marine is still liable in indemnity, because of its failure to correct the defect, which it is argued, amounted to bringing the unseaworthiness into play. Burnside believes that its conduct in furnishing a presumptively unseaworthy vessel does not amount to "active hindrance" of Federal Marine in

the exercise of its duties, because Federal Marine had the opportunity, and in fact the duty, to correct the open condition of the deep tank but failed to do so. Consequently Burnside argues that no genuine issues of material fact remain, and it is entitled to summary judgment.

We cannot agree. At this juncture, crucial facts remain uncovered with respect to the activities of Federal Marine's employees in the area of the deep tank. Indeed, we do not yet know if the longshoremen had knowledge of the open hatch covers prior to the accident. This issue of fact is vigorously contested. Although McNeill was present when the deep hatch covers were "winged out" prior to June 2, it is suggested that the ship's personnel had from 4:00 p. m. of June 1 until the time of the accident to correct the dangerous condition. Defendant argues that McNeill may well have assumed that the hatch covers were so replaced, and went into the area merely to check it for safety. In any event, substantial dispute remains respecting the happenings prior to the accident.

Furthermore, no stipulation could be achieved as to the relative duties of inspection imposed upon the parties. Whether defendant should have been aware of the defect, if in fact it was not, depends upon the circumstances surrounding the accident. Although various legal principles have been evolved with respect to duties of inspection [1], where issues of negligence are disputed, as here, it seems apparent that crucial factual matters remain to be resolved.

The waters are muddled at this time. The proper place to clear them by filling in the factual discrepancies and resolving the remaining factual disputes is at trial.

Many gaps in the Court's knowledge exist at this time with respect to the precise circumstances of and preceding the accident. After establishing these facts, the Court would be in a position to assign the various duties of the parties.

A motion for summary judgment may be granted only when no genuine issue of material fact exists. On the present state of the record the salient facts are far from clear. The motion of Burnside Shipping is denied.

### Plaintiff's Motion to Dismiss the Counterclaim

The counterclaim is a direct suit by Federal Marine against Burnside for indemnification to recover all payments made by the former, or its insurer, to McNeill's widow and/or her children, pursuant to the Longshoremen's and Harbor Workers' Compensation Act. Federal Marine's liability under the Act is imposed without regard to fault.

Plaintiff's motion to dismiss is premised upon the belief that defendant may not maintain a direct action against plaintiff, even assuming the latter to be solely or contributorily responsibile for the accident. Plaintiff maintains that any rights enjoyed by Federal Marine are derived by subrogation or assignment to the rights of its employee.

The death of McNeill vested a cause of action for wrongful death in his personal representative. Plaintiff asserts that Illinois law is controlling on this derived claim, and that under the Illinois Wrongful Death Statute (Ill.Rev.Stat. c. 70 Sec. 2), liability is limited to $30,000.

The dispute then, is whether Federal Marine may sue in its own right in a direct action for the full amount of the compensation to be paid under the Act,

---

1. In Smith & Son, Inc., v. Skibs A/S Hassell, 362 F.2d 745, 747 (5th Cir. 1966), it is stated:
   "Smith's contention that a stevedore is not to be charged on its warranty by reason of a failure to make an inspection is based upon an established principle. Cia Maritima Del Nervion v. James J. Flanagan Shipping Corpora

   tion, 5th Cir. 1962, 308 F.2d 120. There is a related rule that defects which are in fact observed cannot be overlooked. If the stevedore has knowledge of a defect it should correct it or require it to be corrected by the ship's officers * * * (citing cases)".
   See D/S Ove Skou v. Hebert, 365 F.2d 341, 350 (5th Cir. 1966).

approximately $70,000, or must maintain a wrongful death action as subrogee of McNeill's personal representative. If the latter theory is upheld, a further question may arise—are the recoverable damages limited by the Illinois Wrongful Death Act, or may the employer, as subrogee, recover the entire amount to be paid in compensation.

Defendant concedes that a direct action is a novel theory, but suggests some situations which allegedly are similar or analogous, and which support its theory.

The theory relied upon by defendant is summarized in Section 96 of the Restatement of Restitution, as follows:

"A person who, without personal fault, has become subject to tort liability for the unauthorized and wrongful death of another, is entitled to indemnity from the other for expenditures properly made in the discharge of such liability."

■ The existence of such a direct right over is well established in certain situations, as the cases cited by defendant show. See e. g. Sleck v. Butler Bros., 53 Ill.App.2d 7, 202 N.E.2d 64 (1964); Jones v. Waterman S.S. Corp., 155 F.2d 992 (3d Cir. 1946); Gore v. Maritime Overseas Corporation, 256 F.Supp. 104 (E.D.Pa.1966).

However, in the instant case unlike the ones cited above, we must be governed by the provisions of the Longshoremen's and Harbor Workers' Compensation Act, which provides in section 33(b) (33 U.S.C. Sec. 933(b)):

"Acceptance of such compensation under an award in a compensation order filed by the deputy commissioner, *shall operate as an assignment to the employer of all right of the person entitled to compensation to recover damages against such third person,* unless such person shall commence an action against such third person within six months after such award." (emphasis added)

■ The Supreme Court has interpreted section 933(b) to mean that the employer may sue in his own name, Aetna Life Ins. Co. v. Moses, 287 U.S. 530, 539–540, 53 S.Ct. 231, 77 L.Ed. 477 (1932), but that his rights are derived from the person entitled to compensation. Doleman v. Levine, 295 U.S. 221, 55 S.Ct. 741, 79 L.Ed. 1402 (1935). Since the beneficiary or personal representative may sue only under the wrongful death statutes, the employer is likewise limited to a derived action under the state wrongful death statute. *Aetna,* supra. The employer's rights under section 933 (b) have been interpreted to be exclusive, Reiss S.S. Co. v. Cyr, 138 F.Supp. 834 (D.C.Ohio 1954), and consequently, we think, prevent him from maintaining an independent cause of action against the third party tortfeasor. The rationale was well put in California Casualty Indemnity Exchange v. United States, 74 F.Supp. 401, 404 (S.D.Cal.1947):

"The right of recoupment on the ground of third party liability is not a right created in the libelants by Statute as in the California Compensation Act. California Labor Code Sec. 3852, Morris v. Standard Oil, 200 Cal. 210, 252 P. 605. The difference lies in the fact that the rights of the employer and its insurance carrier under the Longshoremen's Act result solely by an assignment of the original rights of the injured person, which original rights are not created by the Statute. The act of the injured person, or representatives of decedent in seeking and accepting compensation under the Longshoremen's Act operates as an assignment of those rights *and creates no new right of action on the employer* as is done in the California law. The assignee has and can have no greater right than the assignor. * * * " (emphasis added)

In our judgment, defendant's theory of a direct action cannot be supported, and its counterclaim must be dismissed without prejudice to the filing of an amended counterclaim which alleges a cause of ac-

tion derived from the persons entitled to compensation. If such an amendment *is* filed, we may then have occasion to consider whether as subrogee or assignee, the defendant's possible recovery is limited by the damage ceiling of the Illinois Wrongful Death Act.